et al., case number 251955. Good morning, Your Honors. Cameron Mann, may it please the Court, Cameron Atkinson, on behalf of Milford Christian Church, Pastor James Moomer, Janet Parody, and Jessica Cabaretta. I'm going to focus my argument on the free exercise claims, unless the Court has some issues, some questions about the other issues. And I'd submit that you should reverse dismissal of our free exercise claims for three reasons. First of all, Mirabelli v. Bonta established that Mahmoud, the Supreme Court's Mahmoud decision, applies beyond the school curriculum context, including in public health context. Second, the burden on our free exercise case rights in this case is worse than the one in Mahmoud, which triggers strict scrutiny. And Connecticut's daycare vaccination requirement does not survive strict scrutiny. With respect to the Supreme Court's stay grant in Mirabelli, that is unequivocally a public health case in our view. Mirabelli expressly pointed out that the problem that California was addressing through its statewide school policies was, quote, gender dysphoria. It described that condition as having an important bearing on a child's mental health. And we know that mental health concerns extend beyond just the individual issue. They can have broader populational side effects, which are similar to an interest akin to vaccination. The Supreme Court does not say Mahmoud does not apply in this public health context. It specifically rejects the Ninth Circuit's attempt to limit Mahmoud to the curriculum context, does not change Mahmoud's analysis because there's a public health concern, and it applies strict scrutiny, which is triggered by the parental right to have a say in directing their children's religious upbringing. That alone, in this case, should merit reversal of the district court. We recognize that the district court didn't have the benefit of Mirabelli in this case, but now you do. And Mirabelli is clear that Mahmoud does apply here. We're talking about a burden that is akin to the burden, or worse, as we submit in Mahmoud, because we're talking about vaccination being irreversible. The children in Mahmoud could have mentally rejected the LGBTQ storybooks and the messages conveyed. They could have adhered to their parents' teaching. The parents here don't have the vaccine. Once you get it, there's no way you can un-get it. And additionally, what we're dealing with here is worse than Mahmoud because the parents in Mahmoud had other options, even though the Supreme Court said that some of them weren't good. The Mahmoud parents still had access to private schools, religious schools, that would align with – Can I ask you something about Mirabelli, which is that it's not even really a decision that you're primarily now relying on? Is that correct? I would not say primarily. I'd say a large degree of reliance, but the core decision we're still relying on is – Is it a vacature of a state? Yes, Your Honor. The way I would suggest that you think about it is Mahmoud resolves the question of law. Mirabelli is a well-reasoned conclusion of law that applies to both in that case and can apply forward. And when this Court looks at its own precedents, particularly when it issues a decision on a preliminary injunction, and I'm thinking of the Second Amendment decision you issued in Antonyuk v. Chimento, subsequent panels of this Court have applied Antonyuk's legal conclusions about Bruen as a well-reasoned point of law to future cases. They've considered themselves bound because it was a legal determination, even though there could have been additional factual elaboration that could have changed the calculus ultimate result. But that's the way I'd suggest that you look at Mahmoud, or Mirabelli, sorry, is it's a well-reasoned point of law that you should apply in this case. With respect to the strict scrutiny analysis here, Connecticut had options. There were, there was, to a large degree, and this was pled in our complaint, there was rampant secular noncompliance, simple noncompliance with its vaccination policies. There still is that perseveres to this particular day. It could have reformed its exemption processes to require affidavits. It could have drawn a public school versus private school distinction, and it could have created a carve-out to allow people of faith to simply practice their faith in peace. It could have identified or heard immunity thresholds, which that is what they looked at, the 95% threshold for the MMR vaccine as being its objective. It could have identified that threshold percentage, and then it could have said we're going to divide religious and medical exemptions equally. Beyond those solutions, it could have put in place when there is a disease outbreak, it could have quarantined students, unvaccinated students at home, all common sense safety measures that still would have allowed people of faith to enjoy the same benefits of our society as every other person does while still fulfilling the state's public health goals. Let me ask you another question, Mr. Hankinson. So, as I understand it, the part of the state's argument is that, in effect, religious students, such as they are, are not really treated categorically differently from secular students or schools. That, I think, is the fundamental argument on the facts, that everyone is treated neutrally, sort of the same. What is your response to that? Two responses. First of all, they're not, because students who receive medical exemptions, which is a quintessential secular reason for not becoming vaccinated, are allowed in schools and daycares. And second, if I understand your question correctly, that would only go to a neutrality analysis under the old employment division versus Smith regime. Are you saying that a student who needed and was entitled to a medical exemption at Milford would not enjoy an exemption, just like a person with a medical exemption at the public schools? No, the state allows Milford to honor medical exemptions. So that goes back to the prior question, which is are they not being treated the same as all the other students? On an entity level, yes, but the students themselves, the entities they're reading, are treated the same. Milford is being treated the same as a public school, but not as the same as a private K-12 school, because the state in this case disavowed its ability to enforce its school vaccination mandate against private K-12 schools. And if you were to stand outside Milford Christian Church, the picture is striking. The church is in the center. The daycare is on the left. The K-12 schools are on the right. On the K-12 school side, you can honor religious exemptions from vaccinations, and on the daycare side, you can't. The church is literally, picturesquely, the dividing line between whose religious liberty is respected and whose religious liberty is not. Does that have to do with grandfathering? No. Grandfathering was anyone, I believe, before, who declared a religious exemption before April 28, 2021. The state's concession in this case was it did not have the authority to enforce the K-12 vaccination mandate against private K-12 schools. The way the statute is written is each local school board and in the — This is all about public schools? No, this is about a private daycare on a private K-12 — No, no. Just to go back to what you said, it's public K-12 or private K-12? So I apologize if I'm not clear. I was not clear. The statute, and I'm paraphrasing, says every local school board shall enforce compliance with this vaccination requirement. So the local school board is a public school? No, because in the statutory scheme, the administrative body for a private school is considered to be the equivalent of a local school board. So this is all students, K-12. You have a pre-K? We have a pre-K, and we have a private K-12 school at Milford Christian Church. The daycare is licensed through the Connecticut — I understood, but maybe I misunderstood, that this litigation, this particular litigation was focused largely on the daycare pre-K. Yes, and the reason it's focused only on the pre-K is because we initially brought the case both as to the private K-12 school and then as to the daycare. The state, in one of its briefs to Judge Bolden below, said we do not have the authority at the state policy level to enforce the requirement against the private K-12 school. So they're in the clear. Judge Bolden dismisses the state education defendants because he finds a lack of subject matter jurisdiction, because there's no threat of enforcement. There's nothing there that would say we're going to enforce it there. The only part of this case that's left is the left side of the church, which is the daycare. All right. So you've reserved, Mr. Atkinson, some time for rebuttal to me from the state. And then we'll hear again from you. Thank you. Assistant Attorney General Darren Cunningham for the State of Connecticut. Your Honors Counsel, may it please the Court. Nearly five years ago, the State of Connecticut enacted the measures it issued today in order to protect public health of our children. This decision was very carefully, very deliberately made, with no hostility whatsoever towards religion. Counsel has framed the issue in a certain way, and I'd like to change that a little bit. I'm happy to talk about the free exercise claims, which I agree are the gravamen of his arguments. The plaintiffs concede that they need strict scrutiny to apply, otherwise they can't succeed. And this Court has already held in We the Patriots that Connecticut's vaccination law was neutral and generally applicable. The plaintiffs then seek to differentiate We the Patriots on the basis of the Supreme Court's recent decision in Mahmoud. However, Mahmoud made clear that Smith was still the standard and that incidental burdens on religious exercise are permitted, so long as they are part of a neutral and generally applicable policy. And Mahmoud also made clear that the test established in Yoder was an exception to this general rule. And if you look at footnote 14 of Mahmoud, the Court actually says that the burden in Mahmoud was exactly the same as in Yoder. So Mahmoud was really, did not extend Yoder, merely applied it and said that the burden was exactly the same. And it's the burden that's the key. Incidental burdens still receive the Smith test. Mahmoud and later Mirabelli, which opposing counsel discussed, in fact, in Mirabelli, the Court said, and I agree with Judge Loya about the posture of that case, but in Mirabelli, the Court actually said the burden was even worse than Mahmoud and Yoder. So there really hasn't been a change in the law at all with respect to Yoder. And Yoder itself, as we discussed in our brief, specifically mentions compulsory vaccination laws. And I think when you talk about compulsory vaccination laws, Judge Wilkinson's recent decision in the Fourth Circuit, which we cited in our 28-J letter of April 16th, talks about the distinctions in these matters. Matters of public health for over 100 years of Supreme Court precedent with respect to vaccinations have been treated differently. The burden is simply not the same. I was on a panel in November of 2020 where I thought exactly what you just said, and that view went out the window as a result of a Supreme Court decision. So there's some limitation to the State's ability to rely on matters of public health. Well— As a matter of—within the construct of the exercise of the law. I understand your point, Your Honor. I mean, certainly the Smith test has the Supreme Court, members of the Supreme Court have expressed some uncomfortableness with that test. But that test remains. This Court is bound by that test. It's also bound by the We the Patriots decision. And I do think that although Smith justices have expressed concerns about Smith, it remains good law. In fact, this week I believe the Supreme Court granted cert in a case and only on the first two questions presented. The third question was actually to overrule Smith, and they did not grant cert on that question. So the point I'm trying to make about all this is that Smith remains very good law. It's specifically discussed in Mahmoud as still applying as the law. And as I said in Mirabelli, the Court made clear that the burden imposed in that case was actually worse than Yoder and Mahmoud. What do you say to Mr. Atkinson's argument that there are like eight or ten different ways in which the government's legitimate interest in protecting people from a pandemic could be achieved without this measure? So I think that that analysis would certainly come into play if we had strict scrutiny. What I would say is that, and Judge Wilkinson talks about this too, is the nature of legislation. If you don't have strict scrutiny, your adversary is conceded. Right. They lose. Right. So we're only talking about strict scrutiny. Yes, Your Honor. What I would say is that we could all come up with obviously a number of ways. But why not do that in respect for people's religious principles? So I think the concern here was with the legislation. First of all, there were accommodations made. Obviously what's referred to as the grandfathering or the phase-in clause was certainly an accommodation made. So it wasn't, and there was, as the We the Patriots Court stated, there was absolutely no hostility towards religion throughout this process. It was very careful and very deliberate. And what I would say is that the State of Connecticut was faced with an increasing rate of religious exemptions. There were, this is, the statistics are in the We the Patriots decision. There were a large number of large schools that had fallen below herd immunity, and this was a deep concern of the Connecticut legislature. And I don't think it's a stretch to say religiosity in large parts of the country are going down. And at the same time, in Connecticut, we had the number of religious exemptions going up. So the legislature was very concerned about this and enacted this carefully constructed statute. And I will say this, too. Some of the, we lost on this issue before the district court, but our argument has always been that this grandfathering exception really shouldn't be in Your Honor's minds when you discuss this because there's never been a grandfathering exception for preschool and daycares. That exception only applies to K-12 schools. And remind me, why did you lose that? I mean, what you're saying makes sense, but why did the district court disagree? She said basically, or sorry, Judge Bolden said that it was still, the plaintiffs could still use it to buttress their arguments is essentially what he held. I've never sort of understood that. I've taken it, and I argued this, that if you had, say, college vaccination requirements and regulations, could then a daycare use that to support its arguments? I don't think that that follows. The licensure system in Connecticut is a completely separate agency for daycares and preschools. In Connecticut, there's no state constitutional right to preschool. It's just a completely different animal. So I've never thought that the grandfathering, even though this Court has already said it's okay, I've never thought that it was relevant in this. And just on that point, Judge Loewe, you discussed with Attorney Atkinson this issue of the K-12 schools. And I just want to be more clear about that. What happened was he sued state officials, and we argued that those state officials did not have authority under the state laws to enforce against private K-12 schools the vaccination requirements. But that's really not much of an issue. It's a red herring because there's no question, and they don't even dispute, that those requirements apply to private K-12 schools. So it was really kind of a technical issue about a proper party. May I ask you about Mahmoud and Miller, our case?  So that is pending as a result of Mahmoud's – well, as a result of the board vacating Miller and asking us to reconsider that. What effect do you think that that has on our own case here? So, I mean, as a timeline or a logistical matter, my understanding is the briefing, the supplemental briefing is complete in that case. I know none of you are on that panel, but I would think logistically the court would probably want to see how that case comes out before making a decision in this case, I would assume. And why is that? In other words, what is it about the Miller case that might impact our analysis? Well, I think it would just address the Mahmoud arguments and with respect to compulsory vaccination laws. I would point you to Judge Wilkinson's opinion from April 8th in the Fourth Circuit, which extensively discusses Mahmoud. We had the benefit of Mahmoud in our case at the district court level, so we fully briefed it. We've obviously fully briefed it here. Mirabelli came after, but we filed 28 J letters on that. But I would say Judge Wilkinson's opinion in the Fourth Circuit, I think, is very comprehensive on these points. That really relies entirely on public health. Yes. Yes. Yes. That's correct, Your Honor. We think that it's a totally different animal. Factually, logically, my adversary points out that once you get vaccinated, you can't be unvaccinated. Well, that may be true, but it's also we're talking about a couple doctor's visits. I don't think we're talking about what was at issue in Yoder, which is, you know, daily, eight hours a day instruction. Less time in Mahmoud, but specifically undermining in the plaintiff's views their religious views with respect to their children. So that exception for the public health pivot, so to speak, does two things for you in your view. One is that it helps you with Mahmoud. Right? Second, as a matter of whether or not to apply strict scrutiny, it helps you satisfy even strict scrutiny. Is that it? Well, strict scrutiny, we've argued throughout this case and in all the vaccination cases that I've handled for the State of Connecticut, we've made the argument that strict scrutiny can be met, and we're certainly not abandoning that. And, in fact, in a panel that Attorney Atkinson argued before the Ninth Circuit last week, one of the judges actually said it's very likely that the law in California, compulsory vaccination law, would meet strict scrutiny. So we've certainly never given up that point, if that's what Your Honor is asking. Yes, that is what I'm asking. Yes. And we said in our brief just I do think that if you determine that strict scrutiny applies, that a remand would be appropriate. Because that is not really. Yeah. And I think we cite to a case that I think maybe Judge Parker was on for that proposition. I just think logistically it would make the most sense. I've always been uncomfortable dealing with strict scrutiny at a motion-to-dismiss stage. Yeah. Thank you, Your Honor. And so, Your Honor, I see my time is up. I just, again, want to say that for over 100 years, the U.S. Supreme Court has given special credence to issues of vaccination. As we point out, since 1924, some 100 million people have benefited from the scourge of vaccine-preventable diseases. We would ask that you affirm the district court. Thank you. Thank you very much. So a few points. The first is the Tandon v. Newsom and Cuomo, Roman Catholic Archdiocese v. Cuomo, made clear that there is no public health escape hatch from a First Amendment analysis. My second point is we'll – Well, since I participated a little bit in that during that era, it's not that there's no public health escape hatch. It's a question of what that public health escape hatch looks like. Well, I gently push back on that. Gently. Gently. You can vigorously push back. Gently in the sense of I still think public health is part of the analysis, but it does not get a different analysis than ordinary free exercise analysis. Whether we're talking about Mahmoud, whether we're talking about Smith, you still have to apply the same – So how does history and tradition then affect that? Because it seems to me that public health as a matter of the state's police power has been from the founding, given all the health crises at the founding, has been a core part of the state's power, notwithstanding religion, notwithstanding any other factor and any other value. So tell me, tell me, if we're going to look at, for example, and you've not argued this, but history and tradition, how has public health not been a major consideration? And I understand your view on the Cuomo case, but just describe that. So if we get into history and tradition, and that is the analysis, not strict scrutiny, not what triggers strict scrutiny, I think we get back to the Fulton concurrences. First of all, we need to look at what the original meaning of the free exercise clause text was. Then we need to look at the traditional definitions of the state's police power, what the limiting principles were as a historical matter federally, and then we need to conduct a – Is there an example, is there an example of the free exercise clause taking – having some predominant effect notwithstanding a public health crisis? In other words, maybe I'll flip it. Is there an example of a state being prohibited from engaging in public health protection measures of its citizens because of a free exercise in the early 1800s, whatever, you know, before the Civil War? Give me an example of that. Before the Civil War, no, because we didn't have incorporation at that point. We don't have First Amendment incorporation until the 1940s. Well, I disagree with you a little bit on this, because I think that the federal government, right, had that power. Well, at that point, then, we're getting into a Tenth Amendment issue, and whether the state or whether the federal government – So you cannot give me an example of where a state or the federal government was prohibited by the First Amendment, the religion clauses, from protecting its population as a public health matter. I do not have something like that with respect to the First Amendment, and because the test is – the test we're operating under is different. I didn't have to go do a statewide search. I understand. So standing here today, I don't. So let me ask you a second question. You heard my question to Mr. Cunningham. Miller is presumably, I guess, fully briefed, is my understanding. Why shouldn't this panel wait for a resolution in Miller which was vacated in light of my mood? Because no plaintiff likes to wait, but that answer isn't good enough. Give me another answer. I think you sit as a co-equal panel right now. I don't. There are no co-equal panels on the Second Circuit. I don't confess to know your internal operating procedure. Is there a reason why we shouldn't wait other than you wanted to sit in here? Well, I think you have clear direction. You have clear direction from the Supreme Court about what you should do here. Because of my mood. And Mirabelli. Correct. So I don't think there's any benefit in waiting. I trust you're all— So Mirabelli, you know, it's like a, whatever, relatively speaking, a short opinion, but it is in a very different posture. In other words, just lists a stay or vacates a stay in connection with a preliminary injunction. Is that right? I believe it might have been a permanent injunction. But I don't hold me to that. I think that helps us. We're talking about a motion to dismiss here. The standard that we have to meet is lower than Mirabelli. And I think drawing all the reasonable inferences from what we pled in our complaint in our favor, if we're looking at the critical Mirabelli-Mahmoud question, is what is the impact on the parent's right to direct the religious upbringing of their children? We have given you plenty of allegations here about how vaccination deprives our, my clients of their moral authority to raise their children. It puts them in a position of being hypocrites to their children. When the going gets tough, you just roll with it. I appreciate this argument. I appreciate the argument. The question, as always, at least in part, is what is the limit? What is the limit of that right? And what is the extent of the government's power? But I don't care. So we, I think, have the arguments well in mind. We'll reserve a decision.